William JOHNSON and Connie Johnson, Appellants,

v.

ST. VINCENT HOSPITAL, INC., St. Vincent Emergency Physicians, Inc., Stephen Watson, Robert A. Blackburn, and H. Pete Hudson, Commissioner of Insurance of the State of Indiana, Appellees.

Sharon S. BOVA and Joseph A. Bova, Husband and Wife, Appellants,

v.

Chester KMAK, M. D., Robert Goldstone, M. D., and Broadway Methodist Hospital, Inc., A Corporation, Appellees.

Abed MANSUR, Appellant,

v.

Donald J. CARPENTER, M. D., Indiana Department of Insurance, and H. P. Hudson, As Commissioner of Insurance, Appellees.

Carl W. HINES and Andrew J. Fetsch, As Special Administrators of the Estate of Paula J. Hines, Carl W. Hines, Individually, and Karen Kay Hines, Sandra Carol Hines and William Walter Hines by Carl W. Hines, Their Mutual Guardian and Best Friend, Appellants,

v.

ELKHART GENERAL HOSPITAL and E. L. Fosbrink, M. D., Appellees.

Nos. 1078 S 216, 779 S 178, 379 S 79, and 1179 S 315.

Supreme Court of Indiana.

May 16, 1980.

Forrest Bowman, Jr., Indianapolis, for appellants Johnson.

Karl J. Stipher, James H. Ham, III, Indianapolis, for amicus curiae Indiana State Medical Association.

James J. Stewart, Edward Squier Neal, Indianapolis, for appellee Robert Blackburn.

Geoffrey Segar, Ralph A. Cohen, Indianapolis, for appellee St. Vincent Hospital, Inc.

Aribert L. Young, Donald L. Dawson, Peter G. Tamulonis, Indianapolis, for appellees St. Vincent Emergency Physicians Inc. and Stephen Watson.

Theodore L. Sendak, Atty. Gen., Robert J. Black, Deputy Atty. Gen., Indianapolis, for appellee H. P. Hudson, Commissioner of Insurance of the State of Indiana.

Timothy S. Schafer, Merrillville, for appellants Bova.

David C. Jensen, Hammond, for appellee Robert Goldstone.

Lester F. Murphy, East Chicago, for appellee Chester Kmak.

Jon F. Schmoll, James D. McQuillan, Gary, for appellee Broadway Methodist Hospital.

Theodore L. Sendak, Atty. Gen., Dan S. LaRue, Deputy Atty. Gen., Indianapolis, for Attorney General.

John J. Dillon, William T. Rosenbaum, Indianapolis, for amicus curiae Rockwood Insurance Company and Independent Insurance Agents of Indiana.

Mark W. Gray, Indianapolis, for amicus curiae Indiana Hospital Association.

Saul I. Ruman, Hammond, for amicus curiae Indiana Trial Lawyers Association.

J. B. Smith, Timothy F. Kelly, Randall J. Nye, Hammond, for appellants Hines and Fetsch.

Vernon J. Petri, John J. Fuhs, Spencer, Leon D. Cline, William H. Stone, Columbus, for appellant Mansur.

Geoffrey Segar, Indianapolis, for amicus curiae Indiana Medical Federation.

Karl J. Stipher, James H. Ham, III, Indianapolis, for amicus curiae Indiana State Medical Association.

Arthur A. May, Thomas J. Hall, South Bend, for appellees Elkhart General Hospital and E. L. Fosbrink.

James J. Stewart, Edward Squier Neal, Indianapolis, for appellee Donald Carpenter.

DeBRULER, Justice.

In these cases we consider the constitutionality of aspects of the Indiana Medical Malpractice Act. Ind. Code §§ 16–9.5–1–1 through 16–9.5–10–5. Appellants Johnson brought their medical malpractice claim for death of a minor child occurring in the aftermath of a tonsillectomy in the trial court without first submitting it to a medical review panel for an opinion as required by the Act. Ind.Code § 16–9.5–9–2. The complaint included a separate paragraph seeking a declaratory judgment upon the constitutionality of the statute. Upon their summary judgment motion the trial court determined that the statute governed the claim, upheld the statute, and then dismissed their complaint upon motion of appellees.

Appellants Bova brought their claim for medical malpractice in the trial court for wrongful injury to the ureter and kidney of Mrs. Bova occurring as a consequence of a hysterectomy. This complaint was also filed in the trial court without first submitting it to a review panel as required by the Act, and included a paragraph of complaint for declaratory judgment upon the constitutionality of the statute. The trial court found the Act governing, the Act consistent with the Constitution, and the motion of appellees for summary judgment for noncompliance with the Act well taken.

Appellant Mansur brought his claim for wrongful injury and loss of vision to his right eye resulting from the negligence of a physician in examining, treating, and diagnosing him. He also challenged the Act in a paragraph of his complaint on constitutional grounds. The trial court determined that the claim was subject to the Act, that the Act was constitutional, and that the malpractice claim should be dismissed because claimant had not complied with the provisions of the Act.

The Hines case involves a claim seeking damages for the wrongful death of Paula J. Hines on behalf of her husband and dependent children, such death being attributed to the negligence of her physician and the hospital in providing her with treatment and care. The trial court dismissed the complaint, finding that the Act was constitutional, and that appellant had failed to comply with its requirements. This case was previously filed in the Federal District Court and was dismissed for failure to comply with the Indiana Act. That court found the Act constitutional. *Hines v. Elkhart General Hospital et al..*, (N.D.Ind. South Bend Div., 1979) 465 F.Supp. 421. The district court's judgment was affirmed on August 3, 1979.

Pursuant to Ind.R.App.P. 4(A)(10) we have permitted transfer to this Court. These appeals were heretofore consolidated for the purposes of argument and are now consolidated for opinion.

In the Mansur case a great deal of proof descriptive of the conditions in the health care and insurance industries which gave rise to the Act was brought forth and developed at a trial for constitutional purposes. Immediately prior to its enactment seven of the ten insurance companies writing the majority of medical malpractice insurance policies in the State ceased or limited writing such insurance because of unprofitability or an inability to calculate an adequate premium. Premiums had already increased as much as 1200 percent over a period of fifteen years because of the increase in the number and size of claims. Physicians practicing high risk specialties such as anesthesiology were hard pressed or totally unable to purchase insurance coverage. In some rural areas surgery was reported cancelled. Emergency services were discontinued at some hospitals. Health care provid-

ers had become fearful of the exposure to malpractice claims and at the same time were unable to obtain adequate malpractice insurance coverage at reasonable prices.

According to the Legislature's appraisal, these conditions implicated the vital interests of the community in the availability of the professional services of physicians and other health care providers. The Legislature responded with this Act in an effort to preserve those services and thereby to protect the public health and wellbeing of the community. It reflects a specific legislative judgment that a causal relationship existed at the time between the settlement and prosecution of malpractice claims against health care providers and the actual and threatened diminution of health care services. The exceptionally high cost and even unavailability of malpractice insurance were major links in the relational chain. They in turn were connected through the large settlements and judgments being paid to patients. To the extent that these sums were excessive or unjustifiable, they had become so large because the processes by which evidence of negligent conduct was being gathered, evaluated, and used were faulty. Subsidiarily, these sums were being unnecessarily increased because the habitually negligent health care providers were not being identified and dealt with, very large attorney fees were being charged, and the time limitations upon bringing malpractice actions were too long.

With these judgments as its basis the Act created voluntary state-sponsored liability insurance for doctors and other health care providers, created a patient compensation fund, took measures to prevent injuries to patients through the negligence of health care providers, and subjected negligence claims against health care providers to special controls limiting patient remedies.

The issue in this appeal is whether those special controls and limitations are consistent with the guarantees of the Indiana and Federal Constitutions. Appellants complain of the following features of the Act:

(I) Before filing suit in court, plaintiffs must submit their complaints to the Commissioner for consideration by a medical review panel. The panel renders an opinion which is admissible at trial. Appellants contend these and related provisions violate the (A) jury trial provisions of Art. I, § 20, of the Indiana Constitution; (B) due process and (C) equal protection clauses of the Fourteenth Amendment, and the Indiana Constitution, the rights and privileges clause of Art. I, § 23, of the Indiana Constitution; and (D) the separation of powers doctrine of Art. III, § 1, of the Indiana Constitution.

(II) Recovery in malpractice cases is limited to $500,000 when health care provider has elected to come under the Act. Appellants challenge this limitation relying upon the due process and equal protection clauses of the Fourteenth Amendment and the Indiana Constitution, the rights and privileges clause of Art. I, § 23, of the Indiana Constitution, the right to trial by jury guaranteed by Art. I, § 20, of the Indiana Constitution.

(III) Attorney fees to be paid plaintiff's attorney are limited by the Act. This limitation is challenged as contrary to the due process and equal protection clauses of the Fourteenth Amendment and the Indiana Constitution.

(IV) The time in which a malpractice action may be brought is severely limited by the Act. This limitation is challenged as contrary to the guarantee of the due process and equal protection clauses of the Fourteenth Amendment and the Indiana Constitution.

(V) The plaintiff's complaint may not ask for a specific amount in the prayer. This limitation is challenged as contrary to the due process and equal protection clauses of the Fourteenth Amendment and the Indiana Constitution, the free speech and writing provision of Art. I, § 9, of the Indiana Constitution, the separation of powers mandate of Art. III, § 1, of the Indiana Constitution, and it furthermore conflicts with the trial rules.

(VI) The Act provides for the creation and management of a patient's compensation fund. This provision is challenged

as contrary to the prohibition against special legislation in Art. IV, § 23, of the Indiana Constitution and Art. XI, § 12, of the Indiana Constitution which prohibits the State from giving or loaning its credit in aid of any person.

The records before us amply demonstrate that the four trial courts below were vested with authority to adjudicate the many constitutional claims; that appellants had standing to assert those claims; and that the claims themselves were fully litigated in a suitable adversarial atmosphere and permit of reasonable judicial resolution. *Board of Commissioners of Howard Co. v. Kokomo City Plan Commission*, (1975) 263 Ind. 282, 330 N.E.2d 92. Plaintiffs below, appellants here, sought to litigate their claims directly in court and were turned away because specific requirements of the statute, not previously imposed by law upon them, had not been followed. No avenue to dispose of these cases on non-constitutional grounds have been suggested by the parties and we perceive of none. *Reilly et al. v. Robertson, et al.*, (1977) 266 Ind. 29, 360 N.E.2d 171; *Passwater v. Winn*, (1967) 248 Ind. 404, 229 N.E.2d 622.

 In considering these constitutional challenges, we accord this Act with every reasonable presumption supporting its validity and place the burden upon the party challenging it to show unconstitutionality. *Sidle v. Majors*, (1976) 264 Ind. 206, 341 N.E.2d 763; *Robertson v. Reilly, supra.* Before a statute will be declared repugnant to the Constitutions its fatal constitutional defects must be clearly apparent. *Board of Commissioners of Howard Co. v. Kokomo City Plan Commission, supra.* A statute is not unconstitutional simply because the court might consider it born of unwise, undesirable, or ineffectual policies. *Sidle v. Majors, supra; Reome v. Edwards*, (1948) 226 Ind. 229, 79 N.E.2d 389.

Medical malpractice acts similar in nature and scope to Indiana's Act have recently been enacted in other states. The vast majority of state and federal appellate level courts have found them consistent with due process, equal protection, and jury trial guarantees. *Attorney General of Maryland v. Johnson*, (1978) 282 Md. 274, 385 A.2d 57; *Carter v. Sparkman*, (1976) Fla., 335 So.2d 802; *Comiskey et al. v. Arlen et al.*, (1976) 55 A.D.2d 304, 390 N.Y.S.2d 122; *Eastin v. Broomfield*, (1977) 116 Ariz. 576, 570 P.2d 744; *Everett v. Goldman*, (1978) La., 359 So.2d 1256; *Parker v. Children's Hospital of Philadelphia*, (1978) 483 Pa. 106, 394 A.2d 932; *Paro v. Longwood Hospital*, (1977) Mass., 369 N.E.2d 985; *Prendergast v. Nelson*, (1977) 199 Neb. 97, 256 N.W.2d 657; *State ex rel. Strykowski et al. v. Wilkie*, (1978) 81 Wis.2d 491, 261 N.W.2d 434; *Woods v. Holy Cross Hospital et al.*, (5th Cir. 1979) 591 F.2d 1164. The highest courts of two states have held such acts unconstitutional. *Arneson v. Olson*, (1978) N.D., 270 N.W.2d 125; *Wright v. Central Dupage Hospital Ass'n*, (1976) 63 Ill.2d 313, 347 N.E.2d 736. None of these opinions is, of course, binding upon this Court; however, the reasoning in them has been useful.

## I.

### A.

 Some appellants contend that impermissible delay and expense in getting to jury trial result from the requirement of the Act that the malpractice claim be submitted to a panel for an opinion. Indiana Code § 16–9.5–9–2, provides that:

> "No action against a health care provider may be commenced in any court of this state before the claimant's proposed complaint has been presented to a medical review panel . . . and an opinion is rendered by the panel."

Indiana Code § 16–9.5–9–3.5(a) provides that:

> "The panel shall render its expert opinion within one hundred eighty (180) days of the selection of the last member."

Compensation of panel members and the chairperson may not exceed an aggregate of $1250 plus reasonable travel expenses and such fees "shall be paid by the side in whose favor the majority opinion is written." Further costs to the parties will result from the requirement that they submit

their evidence to the panel promptly. Ind. Code § 16–9.5–9–4. Appellants invoke Art. I, § 20, of the Indiana Constitution which guarantees that "In all civil cases, the right of trial by jury shall remain inviolate."

In *Hayworth v. Bromwell*, (1959) 239 Ind. 430, 158 N.E.2d 285, this Court concluded that former Rule 1–8A of this Court fixing the time within which a request for trial by jury must be made did not violate the right to trial by jury, saying:

> "The provision of the Constitution of Indiana that the right to a trial by jury in all civil cases shall remain inviolate means that the substantial elements and incidents, which pertained to a trial by jury at common law, shall not be altered or changed by the Legislature or the courts and are preserved in substance as they existed at common law." 239 Ind. 437, 158 N.E.2d at 288.

> "[I]t is the substance of the right which 'shall remain inviolate,' not the manner in which it is exercised or waived." 239 Ind. at 435, 158 N.E.2d at 287.

That rule imposed a waiver of the right upon the failure to timely request a jury trial. Pursuant to the rule the decision to exercise the right was required to be made at a time certain during the pretrial period. The rule can be harsh in application where events occurring after a waiver create a need for a jury trial as the right could not thereby be resurrected. Nevertheless this waiver rule was held not to be a substantial impairment of the right and to be a reasonable regulation of it. In *Warren v. Indiana Telephone Co.*, (1940) 217 Ind. 93, 26 N.E.2d 399, the claim that the Workmen's Compensation Act abrogated the right to trial by jury was rejected because the employee voluntarily elected to be bound by the Act and therefore "is in no position to complain that his right to a jury trial is no longer available to him." Nevertheless, as a practical matter the right of the workman was significantly burdened by the statutory presumption of such election from the failure to give a formal written notice of exemption.

It is quite clear that the Malpractice Act does not take away the right to a jury trial. The right is fully accorded after the delay and expense occasioned by the panel submission requirement. We must therefore attempt to assess the import of the requirement upon the right. In the *Hayworth* and *Warren* cases the right was subject to being entirely lost due to unknowing inaction by a party. Loss of the right is not within the risk created by the Malpractice Act.

Delay in the commencement of a trial and the expense of investigating and marshalling evidence are part and parcel of the preparation of any piece of civil litigation. Delay routinely occurs between the decision to prosecute a claim and the trial. Expenses for investigation and preparation attend the pre-trial preparation of all claims. The panel submission requirement generates evidence admissible at a future trial of the claim. The delay in the trial occasioned by this process and the cost attendant to it are in major part like those to be expected in any case. The participation by the parties in the panel processes will satisfy to a great extent their preparation needs. Such satisfaction will tend to reduce total aggregate time for trial preparation. Thus, the delay complained of will be offset to an appreciable extent. The cost to the party in whose favor the opinion is rendered would be in the range that such party would expect to pay to develop such evidence individually. And the cost to the party against whom the opinion is rendered has been subjected to a cost by the process which would be much the same as he expects to pay to discover his opponent's evidence. The panel submission requirement does impinge upon the right to trial by jury, but in so doing does not alter or change and does not impair the right contrary to constitutional limitation. The delay and expense complained of does not alter or change the substantial elements and incidents of the jury trial right for either party.

■ Relying upon the same constitutional right to trial by jury some appellants contend that the panel opinion will by its biased character and special potent proba-

tive force when presented to the jury as part of the evidence violate the guarantee of the right to trial by jury. Indiana Code § 16–9.5–9–3, provides in part that:

"The medical review panel shall consist of one (1) attorney and three (3) health care providers."

According to appellants the opinion of the panel will be biased in favor of the health care provider against whom the complaint has been lodged. There is a large degree of speculation here. Each side to the controversy is entitled to select one of the panel members. The attorney chairperson will be committed by reasons of training and professional experience and standing to urge adherence to fair procedures and standards. These structural features will tend to ameliorate any tendency toward bias. And moreover, if there is a risk that the panel opinion will favor the health care provider, as perceived by appellants, simply by reason of the makeup of the panel, the jury can be made aware of it through articulate and imaginative advocacy. We are convinced that the jury drawing upon its collective experience and good sense, and under the oath to well and truly try the cause, will be fully capable of according the panel opinion the weight and credit to which it is justly entitled. The statute insofar as it permits the opinion of the panel of health care providers to be admitted in evidence does not constitute a substantial and impermissible restriction upon the right to trial by jury.

Appellants next argue that the practical effect of the introduction of a panel opinion unfavorable to the plaintiff is to increase the plaintiff's burden of persuasion before the jury, and is consequently violative of the right to trial by jury. It is fairly to be argued that the verdict of the jury will depend upon the impact of the panel's "expert opinion", and that the plaintiff must overcome such impact if he is to win. This effect, however, cannot be separated from the trial as a whole if its impact is to be fairly assessed. No panel opinion unfavorable to a plaintiff can reach the jury unless plaintiff has first presented a prima facie case, i. e., that he has presented evidence from which a reasonable trier of fact could reasonably conclude that the elements of the claim have been shown including the breach of duty by the health care provider defendant. It would be an exceedingly rare case in which expert testimony would not be included in the prima facie case. When after the prima facie case has been made and the panel opinion introduced by defendant, the jury considers its verdict, it will then weigh the competing expert opinions. For our purposes here we do not find this situation significantly different from the situation in which a plaintiff presents but a lone general practitioner witness and the defendant then fields three distinguished specialists. The legal burden of persuasion has remained the same, but the task of the plaintiff to persuade has been increased enormously. The increased expenditure of money and effort required in such circumstances to convince the jury that plaintiff should prevail is consonant with our adversary system and the constitutional guarantee of the right to trial by jury.

## B.

Appellants contend that the delay and expense attendant to the panel submission requirement denies them due process and due course of law and access to the courts guaranteed by Art. I, § 12, of the Indiana Constitution and the Fourteenth Amendment.

This requirement bars the malpractice claimant from commencing his case in court until the review panel has rendered its opinion. To this delay is added the expense to the party in whose favor the opinion goes. Later this opinion can undoubtedly influence the outcome of any subsequent trial if introduced into evidence.

The Supreme Court of the United States has described the manner in which courts consider the authority of legislatures to alter common law rules:

"A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any

other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will or even at the whim of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law .as they are developed, and to adapt it to the changes of time and circumstances." *Munn v. Illinois*, (1877) 94 U.S. 113, 24 L.Ed. 77, quoted in *Hurtado v. State of California*, (1884) 110 U.S. 516, 531, 4 S.Ct. 111, 119, 28 L.Ed. 232.

This same basic state legislative authority was addressed in the context of notice statutes and statutes of limitation limiting common law remedies by Justice Shake in *Sherfey v. City of Brazil*, (1937) 213 Ind. 493, 13 N.E.2d 568, thusly:

"If appellant is entitled, under the Constitution, to the enforcement of his common-law action, free of any legislative restraint, then the General Assembly possesses no power to prescribe any limit within which such actions shall be brought. Such a conclusion is wholly untenable." 213 Ind. at 508, 13 N.E.2d at 574.

The Medical Malpractice Act deals with the responsibility as between health care provider and patient. The relationship of health care provider and patient imposes on the health care provider a common law legal duty. The nature and extent of that duty may be modified by legislation. Hence, the Legislature may also validly act to restrict the remedy available for a breach of that duty. This challenged provision of the Act may not be regarded as repugnant to due process simply because it alters the standing manner of achieving a remedy in court, or because it restricts a longstanding remedy.

■ In dealing with the constitutionality of a statute of our State, we do not sit to judge the wisdom or rightness of its underlying policies. When a state legislature enacts a statute such as this which is related to the public health and welfare, such statute in order to be consistent with due process "need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical of Oklahoma*, (1955) 348 U.S. 483, 487–88, 75 S.Ct. 461, 464, 99 L.Ed. 563. Cf. *Steup et al. v. Indiana Housing Finance Authority*, (1980) Ind., 402 N.E.2d 1215.

The Legislature was undoubtedly moved because of its appraisal that the services of health care providers were being threatened and curtailed contrary to the health interests of the community because of the high cost and unavailability of liability insurance. This cost and unavailability was in turn in part the product of an increase in the number of malpractice claims and large judgments and settlements in connection with them, and that they were in turn in part the result of the fact that medical opinion, as free from influence and prejudice as possible under the circumstances, was not readily available to the parties and to the courts. The requirement of the statute that malpractice claims be first submitted to a medical panel for evaluation is one reasonable means of dealing with the threatened loss to the community of health care services in this situation. *Everett v. Goldman, supra; Paro v. Longwood Hospital, supra.*

Article I, § 12, of the Indiana Constitution states:

"All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely and without denial; speedily, and without delay."

■ Appellants have also contended that Ind.Code § 16–9.5–9–2, which provides that "No action against a health care provider may be commenced in any court of this state before the claimant's proposed complaint has been presented to a medical review panel . . . and an opinion is rendered by the panel" is contrary to the

guarantee of Art. I, § 12, that they should have access to the courts. As appellants construe this part of the statute no personal jurisdiction over the health care provider may be acquired in a tribunal having authority to adjudicate the merits of their claims before the panel produces its opinion. We agree with this construction. The medical review panel does not adjudicate the merits of the claim. The filing of a proposed complaint with the commissioner pursuant to Ind.Code § 16–9.5–9–1, and the delivery of copies thereof to the health care providers named in the complaint would not give any court personal jurisdiction over the named defendants. Appellants point out that during the period of time in which the medical review panel is engaged in its functions, the claimant is subjected to the loss of his entire case if the defendant should become unamenable to service of process from a court. Given the maintenance by the Legislature of the malpractice claim and the remedy through the adjudicative process in court, a justification for the imposition of this blanket prohibition must exist if the provision is to be upheld.

As previously concluded the dominant aim of this Act as a whole is to preserve health care services for the community. The delay in instituting suit required by this challenged provision must be reasonable in light of this aim if it is to pass constitutional muster. The delay accommodates the discernment of facts by the medical review panel and the forming of its expert opinion. The participation of the claimant, the insurer, and the health care provider in the panel processes results. Their knowledge and experience so gained will encourage the mediation and settlement of claims and discourage the filing of unreasonably speculative lawsuits. The mental, financial and time-consuming burdens imposed upon health care providers by lawsuits which should have been settled by their insurers or which should not have been instituted will be lessened, and the disruption of and impairment to their continued vital services reduced. Several factors also are present which would support the general proposition that health care providers are likely to be amenable to process after the panel opinion has been made. Each is licensed or legally authorized by the State to provide health care services, or alternatively, is an agent of the same. Most will be permanent fixtures in the communities where they are located, or maintain a practice or are employed. Individual health care providers will have made significant investments in acquiring their skills and will be dependent upon those skills for their livelihood. Moreover, health care providers and their insurers will have been in contact and will have been present and actively engaged in the panel processes up to the point when the panel is prepared to reach its opinion. Furthermore, we note that the prohibition against filing suit is subject to the right of the patient to seek limited discovery in court. Ind.Code § 16–9.5–10–1. This right tends to ameliorate a part of the risk attendant to the prohibition against filing in that it permits the preservation of evidence.

It cannot be doubted that the long standing rule has been that a plaintiff may bring suit as soon as his right of action accrues. *Gallup, Executor v. Schmidt, Treasurer,* (1899) 154 Ind. 196, 56 N.E. 443. It is also true, however, that conditions have long been imposed by law which must be satisfied before a suit may be filed. They carry with them the same danger as this provision of the Act that the potential defendant will leave the jurisdiction or disappear in the meantime and the remedy by court proceedings will be lost. Yet they are not considered as constituting an impermissible restriction upon access to courts. The requirement of prepayment of court costs or proof of indigency at the time of filing suit is one such requirement. Cf. *Thompson v. Thompson,* (1972) 259 Ind. 266, 286 N.E.2d 657. Indiana R.Tr.P. 3 and 4 compel the plaintiff to have a written complaint and prepared summonses at the time of filing suit. The law encourages and even requires that the decision to file suit in most instances be preceded by lawyer-client conferences, investigations, legal study, demands for payment, or settlement attempts. All are

time-consuming events during which the potential defendant may disappear or die.

The restriction upon the access to courts for patients under the Act is severe, yet based upon the above appraisal for constitutional purposes, it is not so restrictive as to violate the right to access to courts guaranteed by Art. I, § 12, of our Constitution. Accord: *Everett v. Goldman, supra; Carter v. Sparkman, supra; Comisky v. Arlen, supra; Paro v. Longwood Hospital, supra.*

The contention is made that the Act should be declared void for vagueness under Art. I, § 12, of the Constitution of Indiana guaranteeing due process and due course of law in that it fails to specify in detail the procedures and practices to be followed before the medical review panel. Appellant raising this issue has admitted inability to cite any firm authority that this constitutional doctrine is applicable in civil cases. He relies upon *Cook v. State*, (1901) 26 Ind.App. 278, 59 N.E. 489. There the Appellate Court voided a penal statute which barred the use of a narrow tired wagon on gravel roads during wet weather. The statute was invalid as uncertain in that it failed to define "narrow tired wagon". In the course of retailing cases, the court quoted from another jurisdiction which recognized the application of the doctrine in testing "public and private" statutes. We are not apprised that such statutes in that other jurisdiction carried no penal or like consequences. Given the clear penal nature of the statute considered by the court in *Cook*, the reliance in it upon the quotation from the foreign jurisdiction does not establish the proposition of law that the void for vagueness doctrine is applicable to testing non-penal statutes.

■ Were it applicable, we would not void this statute on this basis. The statute contemplates that the panel will function in an informal and reasonable manner. It is guided by a trained lawyer who presumptively will not deny to each party a reasonable opportunity to present its evidence and authorities. The scope of the panel's function is limited. It does not conduct a hearing or trial and does not render a decision or judgment. There is, therefore, no reason to mandate that the statute relegate burdens of proof or production and to otherwise specify procedures applicable in hearings and trials. The panel is conducting a rational inquiry into the extent and source of the patient's injuries for the purpose of forming its expert opinion. The absence from the statute of specific procedures is reasonable in light of this limited purpose and function and does not raise a serious constitutional question on the ground of vagueness or indefiniteness. There is little likelihood that appellant will incorrectly estimate the steps that should be taken in procuring and presenting evidence and authorities to the panel, and should he do so there is little or no risk that he will be harmed thereby.

■ The contention is made that the compensation of those serving on the panel is so low as to be confiscatory in violation of Art. I, § 21, of the Indiana Constitution, and that such inadequate provision for their compensation serves to deny the injured patient due process of law. We agree that the compensation appears exceptionally modest for most health care providers and lawyers. However, there is no support here for the claim that panel members will, as a consequence of low pay, fail to provide fair treatment to persons appearing before them. Most will undoubtedly view service on the panel as a public duty in the nature of jury service and service as a special judge, and give due regard to public and private interests being served. The Act is not unconstitutional on this basis.

### C.

■ The panel submission requirement is next challenged on the basis that it subjects malpractice tort claimants to burdens not given to other tort claimants and grants corresponding benefits to health care providers in violation of the privileges and immunities clause of the Indiana Constitution in Art. I, § 23, of the Indiana Constitution, the prohibition against special legislation in Art. IV, §§ 22 and 23, and the equal protection clause of the Fourteenth Amend-

ment. The classification of tort claimants is based upon their status as patients and their injuries having arisen from a breach of duty owed them by a health care provider. The classification of health care providers is based upon the services they render. Neither classification involves a suspect classification such as race, wealth, lineage, alienage or illegitimacy. And a requirement such as this that a party engage in processes for improving the quality of evidence for settlement and litigation purposes does not impinge upon the exercise of a fundamental right such as voting, procreation, interstate travel, or to present a defense in a criminal action. The fair and substantial relation standard is to be applied here. *Chaffin v. Nicosia*, (1974) 261 Ind. 698, 310 N.E.2d 867. In order for this classification to satisfy the guarantee of equal protection, it "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co. v. Virginia*, (1920) 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989; *Reed v. Reed*, (1971) 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225; *Reilly v. Robertson, supra.* The standard to be applied in protecting rights secured by Art. I, § 23, of the Indiana Constitution, is whether the legislative classification is based upon substantial distinctions with reference to the subject-matter, or is manifestly unjust or unreasonable. *Steup et al. v. Indiana Housing Finance Authority, supra; Phillips v. Officials of City of Valparaiso*, (1954) 233 Ind. 414, 120 N.E.2d 398. The same standard is applicable in testing a statute under Art. IV, §§ 22 and 23. *Perry Civil Twp. of Marion Co. v. Indianapolis Power and Light Co.*, (1943) 222 Ind. 84, 51 N.E.2d 371. The statute is therefore presumed constitutional, and the burden was on appellants below to negative every conceivable basis which might have supported the classification. *Madden v. Commonwealth of Kentucky*, (1940) 309 U.S. 83, 93, 60 S.Ct. 406, 410, 84 L.Ed. 590; *Lehnhausen v. Lake Shore Auto Parts Co.*, (1973) 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351.

The legislative purpose to be served by this statute as a whole is clear. Its goal is to protect the health of the citizens of this State by preventing a reduction of health care services. The question for our determination is whether there is some "ground of difference" that makes clear the reason for the different and more burdensome treatment accorded medical malpractice tort claimants and explains the corresponding special consideration given the health care provider. We conclude that a ground does exist and was not negatived by appellants in the courts below. Each citizen is dependent upon practicing health care providers for the treatment of his illnesses and injuries. Medical malpractice cases against health care providers, by reason of their potential number and size, pose a special economic threat to the rewards which health care providers may enjoy in return for their services. They also routinely require the ascertainment of technical and scientific facts, procedures, and expert opinions for the purposes of determining whether a breach of legal duty has occurred. The panel submission requirement serves this requirement and tends to insure that a resolution of a dispute will be based upon the ascertainment of the true facts and circumstances and will be fair; and also tends to insure that the cost to the health care providers participating in a risk spreading combine will be no more than is reasonable and necessary.

We conclude that to the extent the panel submission requirement burdens patient claimants and benefits health care provider tortfeasors, it does so consistent with the equal protection clause and the privileges and immunities section of the Indiana Constitution, and Art. IV, §§ 22 and 23, of the Indiana Constitution. Accord: *Everett v. Goldman, supra; Paro v. Longwood Hospital, supra.*

D.

Article III, § 1, of the Indiana Constitution sets forth the doctrine of the sepa-

ration of powers of the governmental branches. Appellants contend that the requirement of the Act that the panel opinion be admitted in evidence is a usurpation of the judicial authority of the courts to rule upon the admissibility of evidence. Indiana Code § 16–9.5–9–7 sets forth the required contents of the written opinion of the panel and Ind.Code § 16–9.5–9–9 provides that it shall be admissible but not conclusive. This latter provision is a rule for the admission rather than the exclusion of evidence. As such it opens up the trial to the admission of evidence, and that evidence will be considered together with all other evidence presented in arriving at a true verdict or decision. The type of matter declared admissible by this provision, namely, the opinion of medical experts, has heretofore been expressly sanctioned by rules of evidence as declared by the courts. *Dahlberg v. Ogle*, (1978) Ind., 373 N.E.2d 159; *Iterman v. Baker*, (1938) 214 Ind. 308, 15 N.E.2d 365. Consequently, this Act does not take away from the courts their judicial authority. *Paro v. Longwood Hospital, supra.*

## II.

### A.

Challenges have been made to the limitations in the Act upon the amount recoverable for injury due to the negligent conduct of health care providers in rendering their services. The limitations of the Act apply when the health care provider voluntarily qualifies to come under the provisions of the Act. Ind.Code § 16–9.5–2–1. Indiana Code § 16–9.5–2–2 limits the total recovery for injury or death to a patient to $500,000. Indiana Code § 16–9.5–2–2(b) limits the liability of any health care provider to $100,000 per occurrence. Indiana Code § 16–9.5–2–2(c) provides that:

> "Any amount due from a judgment or settlement which is in excess of the total liability of all health care providers . . shall be paid from the patient's compensation fund pursuant to provisions cf IC 16–9.5–4–3."

This last section provides that "the court shall determine the amount for which the fund is liable and render a finding and judgment accordingly." Ind.Code § 16–9.5–4–3(5).

The half million dollar limitation is challenged as violative of the mandate of Art. I, § 12, of the Indiana Constitution that one shall have a complete remedy for injury done to him, and of the due process clause of the Fourteenth Amendment. Legislation will be sustained as within the authority of the Legislature if it is a proper exercise of the State's police power for the promotion of the peace, safety, health or welfare of the public. *Steup et al. v. Indiana Housing Finance Authority, supra.*

The legal analysis involves an appraisal of whether this recovery limitation is a rational means to achieve the goal which the Legislature through its enactment sought to reach. *Ferguson v. Skrupa*, (1963) 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93; *Williamson v. Lee Optical Inc., supra; Sidle v. Majors, supra.* We conclude that the limitation is consistent with the state and federal due process clauses.

In *Usery v. Turner Elkhorn Mining Co.*, (1976) 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752, the United States Supreme Court considered the validity of a statute of Congress which among other things placed liability upon coal mining operators to compensate former employees who had worked in the mines for disability due to black lung disease. The court upheld this retrospective burden growing out of past mine working conditions upon individual operators who had employed such workers, even though the conditions causing the disease could not be deterred by the imposition of the burden and even though such operators could not be justly considered blameworthy for the conditions. The court held that the burden was justified because the individual operators had profited from the workers' labors. It would appear that any employer profits from his employee's labors, in the sense meant by the court, and that therefore any employer could have such a new and original burden thrust upon him for injuries to employees of many years past even though

the working conditions causing an injury were in accordance with safety standards, were deemed safe according to the best scientific knowledge available at the time, and were totally unpredictable. There is a distinct degree of arbitrariness under these circumstances in selecting the individual employer to be the source of compensation for its former employees. There is a similar arbitrariness in selecting injured patients to carry the burden imposed by the recovery limitation under consideration.

Of particular salience here is the recent case of *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, (1978) 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595, which relies in part on the *Usery* case. The court considered the constitutionality of the Price-Anderson Act wherein it placed a dollar limit upon the aggregate liability of licensed private companies and the government due to a single nuclear incident. The limitation was upheld as against a due process and equal protection attack. The court held that the statutory limitation on liability bears a rational relationship to the intent of Congress to encourage private industry to become involved in the production of electricity by use of atomic power. It was recognized that the liability figure would not be sufficient to guarantee full compensation to those injured as the result of a nuclear disaster. There are parallels between the situation dealt with by Congress and the one dealt with by our Legislature. Both involved the lack of an effective risk spreading device for a private industry and a public need to have the industry provide its services. Both involved a private industry which was reluctant to provide its services because of the shortage of effective insurances for the risks attendant to production. In both the Price-Anderson Act and the Indiana Malpractice Act the governments established a form of government sponsored insurance, set limitations upon liability, and placed the burden of the limitation upon persons injured by the industry.

It would appear that the limitation upon recovery is the natural consequent of the establishment of an insurance type program. It provides a factor for calculating premiums and charges to those covered. An insurance operation cannot be sound if the funds collected are insufficient to meet the obligations incurred. It must, however, be accepted that the badly injured plaintiff who may require constant care will not recover full damages, yet at the same time we are impressed with the large amount which is recoverable and its probable ability to fully compensate a large proportion of injured patients. In the same vein, badly injured patients would have little or no chance of recovering large sums of money if the evil the act was intended to prevent were to come about, i. e., that an environment would develop in the State in which private or public malpractice insurance were unavailable or unused. Of some relevance here is also the fact that after suit and recovery against a health care provider is completed, there continues a total lifetime dependency upon other health care providers for vital treatment of the residuum of illness from the prior negligence and of new and unrelated illnesses. Thus to the extent that the limitation upon recovery is successful in preserving the availability of health care services, it does so to the benefit of the entire community including the badly injured plaintiff. Finally, there is evidence in the record before us that the Act with its limitation upon recovery is achieving its intended goal. Accordingly, we find that the limitations upon patient recoveries is not arbitrary and irrational, but furthers the public purposes of the Act in a manner consistent with due process of law guaranteed by our state and federal constitutions.

Some appellants claim that the limitation upon recovery denies due process of law in that it creates an irrebuttable presumption that an injured patient's loss can never exceed the limitation and precludes him from proving otherwise. A statute cannot survive a due process challenge if it denies rights and benefits on the basis of facts presumed to exist and to be true, without affording the individual an opportunity to defend those facts. *Vlandis v. Kline*, (1973) 412 U.S. 441, 93 S.Ct. 2230, 37

L.Ed.2d 63; *Stanley v. Illinois*, (1972) 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551. The Act before us does not create such an evidentiary presumption requiring the trier of fact to infer that the patient's damages are less than $500,000. It is not a presumption which prevents recovery of more than that amount, but the policy of the law in the statute. The limitation is not a denial of due process on this basis.

### B.

■ Upon equal protection analysis some appellants assert that the limitation imposed upon the amount recoverable by patients is void. The limitation does, we agree, impose a special burden upon those persons damaged as a result of medical malpractice in excess of $500,000 which is not imposed upon those suffering damages from the same source with smaller claims. It also bestows a special benefit upon health care providers not enjoyed by others by limiting their liability for damages. We conclude that those features are consistent with the requirements of Art. I, § 23, and Art. IV, §§ 22 and 23 which prohibit special privilege legislation and are consistent as well with the equal protection clause of the Fourteenth Amendment.

■ Where neither a fundamental right nor a suspect classification is involved, the standard of review is that the classification not be arbitrary or unreasonable and that a "fair and substantial" relationship exist between the classification and the purpose of the legislation creating it. *Sidle v. Majors, supra.* It is the nature of the individual interests at stake which determines the applicable equal protection test. The severely injured patients against whom the limitation discriminates are permitted to recover a significantly large sum in partial satisfaction of their claims. Cases will arise however in which this sum will not cover total provable damages. In *Dandridge v. Williams*, (1970) 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491, the highest court of the land considered the validity of a maximum family grant regulation which limited the total amount which any one family could receive because of the presence in the family of needy dependent children. Once the limit was reached the arrival of additional children would not increase the family grant although it was demonstrable that the grant would no longer meet the subsistence needs of the children. The court concluded that this regulation fell in the area of the State's social and economic concerns and that the traditional test of equal protection was properly being applied in evaluating it. In *Sidle v. Majors, supra,* the law under consideration there prevented the injured guest passenger from recovering any part of his loss due solely to the negligent conduct of the driver. In that case we deemed the fair and substantial relation test to be applicable. While the interest of the severely injured patient in full recovery rather than partial recovery to the extent of $500,000, is great for the purpose of selecting the appropriate equal protection test, it is not greater than that of the children needing but being denied subsistence level support in *Dandridge*, and is not greater than that of the injured plaintiff in *Sidle* who could recover nothing. In *Duke Power Co. v. Carolina Environmental Study Group, Inc., supra,* the Supreme Court applied the "fair and substantial relationship" test to a statutory limitation on liability for nuclear accidents, a limitation not unlike the one before us. We conclude that the same test is applicable here, and that it is likewise applicable to testing the Act on the state constitutional grounds used.

This statutory limitation is therefore clothed with a presumption of constitutionality. *Reilly v. Robertson, supra.* And the plaintiffs below, appellants here, had the burden to negative every conceivable basis which might have supported the dollar limitation on recoveries. *Lehnhausen v. Lake Shore Auto Parts Co., supra.*

The burden was upon those appellants below who have relied upon this argument to prove that there was no correlation between the limitation upon recovery and the promotion of health care. *Jones v. State Board of Medicine*, (1976) 97 Idaho 859, 555 P.2d 399. In considering whether the limi-.

tation upon recovery furthers this end in a suitable manner, the reality must be confronted that one deals here with probabilities. In the absence of all insurance, that is a mechanism for spreading risk of loss due to malpractice, claims would have to be paid from the personal assets of health care providers. The probability that a wrongfully injured patient would in fact collect more than $500,000 in damages from that source would be very small. Even when malpractice insurance is available, as in the past, long before the enactment of this legislation, recovery could be stymied in part or in whole by the decision of the health care provider to have no insurance or by his failure to pay a necessary premium, thereby working a forfeiture of coverage. Even when the health care provider is covered by private insurance, and the injured patient has recovered a judgment, total recovery becomes only more probable. The policy limits involved may be less than the amount of the claim. Insurance companies have been known to go bankrupt and to leave those having claims and judgments against insureds of the company without any means of collection. There is good reason to believe that the interests of patients in ultimately transforming valid claims into money is furthered by the availability to the health care industry of some risk spreading mechanism at reasonable cost.

In the record before us evidence was presented for constitutional purposes that part of the private insurance industry did cease making malpractice insurance available to some health care providers in the State. There is support in the record for the proposition that this decision was made because of the number and size of malpractice claims being prosecuted. Some appellants have alluded to less neutral grounds which may have motivated these decisions. For constitutional purposes, the motivation behind the curtailment of the availability of malpractice insurance is of little moment. The fact of that curtailment is very important and is the reality with which the Legislature chose to deal. The Legislature responded by creating the patient compensation fund and the residual

malpractice insurance authority, thereby providing a government sponsored risk spreading mechanism as an alternative to insurance strictly from private sources. In so doing it set the limitations upon recovery. The mechanism cannot operate without the voluntary participation of health care providers. The limitation may well provide health care providers with the incentive to participate. It also facilitates the determination of an annual surcharge to be paid by participating health care providers and the operation of the residual malpractice insurance authority. In effect it would serve the same purpose for the patient compensation fund that such limitations serve in private insurance contracts. The Legislature could have reasonably considered a set limitation upon recoveries to be an essential part of any operable plan to spread the risk of loss to participating health care providers and to regulate the cost to them, and thereby meet the danger it perceived to the public welfare. The classifications of health care providers and injured patients challenged here are but composite parts of the limitation itself and are likewise justified. *Duke Power Co. v. Carolina Environmental Study Group, Inc., supra.* We are aware that the Supreme Court of Illinois was unable to find a justification for a limitation of recovery in malpractice actions against health care providers erected by their own act at this same level. *Wright v. Central Dupage Hospital Ass'n, supra.* Unlike that court, we find a rational justification for the difference in treatment accorded the various groups identified within the rationality of the program launched by the Legislature to protect vital societal interests.

### D.

Appellants take the position that provisions of the Act violate the right of trial by jury by removing the determination of damages in excess of $100,000 from the jury. Their premise is that the right to trial by jury includes the right to have the jury determine all damages. *Cleveland, Cincinnati, Chicago & St. Louis Rwy. Co. v.*

*Hadley,* (1907) 120 Ind. 204, 82 N.E. 1025; *City of Terre Haute v. Deckard,* (1962) 243 Ind. 289, 183 N.E.2d 815.

When a request is made to the trial court for an order to determine the amount due claimant from the patient's compensation fund after a trial by jury on the issue of damages has taken place and the trial court has rendered a judgment, no contest with regard to the total damages due claimant can or does exist. That issue has already been finally adjudicated by the trier of fact. When a prior verdict and judgment have already been rendered, as distinguished from a situation in which only settlement between the parties has been reached, the contested issues raised by the request to the trial court contemplated by the above provisions must therefore logically relate to other matters such as the proper manner of apportioning the total damages among health care providers, their insurers, and the patient's compensation fund. So considered the statute does not withdraw the fixing of damages in excess of the $100,00 limitation from the jury at all. Furthermore, there is no indication in the cases relied upon by appellants that the right to have a jury assess the damages in a case properly tried by jury constitutes a limitation upon the authority of the Legislature to set limits upon damages. The Legislature may terminate an entire valid and provable claim through a statute of limitation. It may validly cause the loss of the right to trial by jury through failure to comply with the requirement to assert the right by procedural rule. It is the policy of this Act that recoveries be limited to $500,-000, and to this extent the right to have the jury assess the damages is available. No more is required by Art. I, § 20, of the Indiana Constitution in this context.

### III.

Some appellants have presented the claim that the limitation in the Act upon attorney fees to be paid counsel for patient claimants is unconstitutional as it interferes with the individual's right to contract and to earn a living and has no rational basis in violation of due process and equal protection. Indiana Code § 16–9.5–5–1 provides:

"(a) When a plaintiff is represented by an attorney in the prosecution of his claim, the plaintiff's attorney fees from any award made from the patient's compensation fund may not exceed fifteen per cent of any recovery from the fund.

(b) A patient has the right to elect to pay for the attorney's services on a mutually satisfactory per diem basis. The election, however, must be exercised in written form at the time of employment."

The legislative purpose of this restriction is to prevent attorneys representing plaintiffs from receiving inordinately large fees where contingent fee arrangements have been made. We recognize that plaintiffs' attorneys frequently and energetically make arduous efforts on behalf of their clients in return for fees which cannot accurately be characterized as inordinately large. However, this Court has also noted that abuses of the contingent fee contracts have occurred and that parties aggrieved by clearly excessive arrangements will receive the protection of the courts. *Scobey v. Ross,* (1859) 13 Ind. 117; *Draper v. Zebec,* (1941) 219 Ind. 362, 37 N.E.2d 952, 38 N.E.2d 995. Contingent fee contracts are sanctioned by the Code of Professional Responsibility so long as the fee is reasonable.

In this case we examine the limitation imposed upon attorney fees for constitutional purposes alone. We find that there is a direct relationship between the limitation upon recovery and the limitation on attorney fees. The total amount recoverable by the injured patient was limited. The limitation on attorney fees follows naturally as a means of protecting the already diminished compensation due claimants from further erosion due to improvident or unreasonable contracts for legal services.

The specific limitation implanted by the Legislature does not seem to be one which will seriously impede the ability of the injured patient to employ effective counsel. It does not effect at all the enforceability of contracts made regarding fees to be paid

from the first $100,000 of recovery, as that amount is not received from the compensation fund. However, contracts providing for fees in excess of the limitation on awards from the compensation fund are not enforceable. The limitation will in practice result in legal fees ranging between about 20% to 35% of the total recovery. As a general proposition fees at this level are commonly considered reasonable in tort litigation.

In *Buckler v. Hilt,* (1936) 209 Ind. 541, 200 N.E. 219, this Court held that the limitation on fees charged by attorneys in workmen's compensation cases was a reasonable exercise of the police power and was not repugnant to due process and equal protection. We recognize that such cases have limited applicability here due to the provision in workmen's compensation acts that the workmen elect to come within their provisions. However, some of the reasoning in that case is applicable. Upon the foregoing analysis we conclude that the same test should be used in considering the limitation on attorney fees as was used in considering the limitation on recovery and that the former is germane to the public purpose of the Act and to be constitutional. The disparate treatment accorded plaintiffs and counsel in medical malpractice cases is the natural consequent of the fact that the Legislature sought in this Act to protect the public interest adversely being affected by a curtailment of malpractice insurance for health care providers.

## IV.

■ The contention is made that the special time limitation and legal disability provision of the Act is contrary to due process and equal protection guaranteed by our Constitutions. It provides:

"No claim, whether in contract or tort, may be brought against a health care provider based upon professional services or health care rendered or which should have been rendered unless filed within two (2) years from the date of the alleged act, omission or neglect except that a minor under the full age of six (6) years

shall have until his eighth birthday in which to file. This section applies to all persons regardless of minority or other legal disability." Ind.Code § 16–9.5–3–1. This provision is different from the general limitation of actions statute, Ind. Code § 34–1–2–2, in that the period of time to which the malpractice claimant is limited commences to run from the date of the "act, omission or neglect" complained of rather than from the date the action "accrued". It is likewise different from the general legal disability statue, Ind. Code § 34–1–2–5, in that there is no legal disability of malpractice claimant by reason of their infancy as between age 6 and age 21. Those appellants raising this claim challenge the classification of claimants by age and by the nature of their action.

Stress is placed upon *Chaffin v. Nicosia, supra.* In that case this Court concluded that the general legal disability statute, Ind. Code § 34–1–2–5, was to be construed to grant a legal disability to infants up to the age of 21 years and that this grant was not in "irreconcilable conflict" with the then existing medical malpractice statute of limitation which granted two years in which to bring such actions. It was observed in that case that to deny infants a legal disability in malpractice cases would be unduly harsh and possibly unconstitutional. Since this case the Legislature has spoken and has expressly denied legal disability to infants between the ages of 6 and 21 years in malpractice cases, while retaining it for those under 6. An "irreconcilable conflict" exists between the general disability statute and this special malpractice disability provision and it is clear that the latter, being later and more specific, controls. *O'Donnell v. Krneta et al.,* (1958) 238 Ind. 582, 154 N.E.2d 45; *Payne v. Buchanan,* (1958) 238 Ind. 231, 148 N.E.2d 537, 150 N.E.2d 250. We are, therefore, confronted with the constitutional issue raised.

The prior statutes as construed in *Chaffin v. Nicosia, supra,* gave a child until he reached age 21 plus two additional years for a total of as long as 23 years to bring a malpractice suit. This legal disability

granted to infants imposed a liability upon health care providers who help children which is unique in nature and extent. Institutional and individual health care providers make services available to hundreds, even thousands, of children in a single year. Children are particularly prone to certain diseases and minor accidental injuries. Each instance in which a child is given health care, the potentiality for a suit years in the future is created for some obstetrician, pediatrician, family practitioner or dentist to name but a few health care providers so affected.

The general purpose of a statute of limitation is to encourage prompt presentation of claims. *United States v. Kubrick*, (1979) 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259. When any alleged tortfeasor is required to defend a claim long after the alleged wrong has occurred, the ability to successfully do so is diminished by reason of dimmed memories, the death of witnesses, and lost documents. As the years between injury and suit increase, so does the probability that the search for truth at trial will be impeded and contorted to the benefit of the plaintiff. This harm can be exacerbated where the injured party continues to grow, develop and change, both physically and mentally, after the injury complained of has occurred. Even under the statute complained of here, the health care provider is subject to defend suits initiated as long as eight years after the injury complained of.

In balancing the interests involved here, the Legislature may well have given consideration to the fact that most children by the time they reach the age of six years are in a position to verbally communicate their physical complaints to parents or other adults having a natural sympathy with them. Such communications and the persons whom they reach may to some appreciable degree stand surrogate for the lack of maturity and judgment of infants in this matter. The Legislature may well have considered the fact of some importance that many health care providers are specially trained professional persons meeting state standards for licensing, and are therefore entitled to a special degree of trust.

In considering this challenge we regard the traditional test of constitutionality to be applicable and that considerable deference should be accorded the manner in which the Legislature has balanced the competing interests involved. *Chaffin v. Nicosia, supra.* The purposes of this Act, previously, repeated in this opinion, are furthered in a rational manner by limiting the legal disability of infants to those under six years of age, and the classification of those entitled to legal disability by age and type of claim bears a fair and substantial relationship to that same end.

## V.

The contention has been made that the limitation on the pleadings and practice in court under Ind. Code § 16–9.5–1–6, is contrary to the due process and equal protection clauses of our state and federal constitutions, the free speech and writing provision of Art. I, § 9, of the Indiana Constitution, the separation of powers mandate of Art. III, § 1, of the Indiana Constitution, and is furthermore in conflict with our Trial Rules. The statute states:

> "No dollar amount or figure shall be included in the demand in any malpractice complaint, but the prayer shall be for such damages as are reasonable in the premises."

It is to be discerned from this provision that the Legislature was concerned with the impact of the dollar figure in the complaint upon the amount of recovery ultimately granted by the trier of fact. The law does not regard the prayer as evidence of proper damages. In spite of the law's admonition, it is obvious that the amount prayed for is in fact the appraisal by some human being of the figure justly due plaintiff. So regarded, the dollar figure in any complaint is subject to being misunderstood by the trier of fact, and such figure could conceivably result in some irrational inflation of the recovery, although the likelihood thereof has never moved the courts to prohibit the practice. This likelihood provides the constitutional justification for the

adoption of this provision in malpractice cases as the Legislature was concerned with insuring the availability of malpractice insurance to health care providers at a reasonable cost. The right of the plaintiff to present evidence of damages and to argue them forcefully to the jury is not curtailed. We are unable to say that the prohibition is not a rational means of furthering the Act's legitimate goals.

In *Neeley v. State*, (1974) 261 Ind. 434, 305 N.E.2d 434, we held that the General Assembly and the courts shared the authority to create rules of procedure for the courts, but where a conflict arose between statutory rules and court rules, the latter shall prevail. It is clear that the Legislature in erecting this pleading requirement has not exercised an authority expressly reserved to the court by Art. III, § 1, or enacted a special law regulating the practice in courts contrary to Art. IV, § 22. Moreover, contrary to the position taken by some appellants, we do not find such a conflict between this prohibition against a specific demand figure in the complaint and Ind.R.Tr.P. 8(A) and 54(C) which would warrant our voiding the statutory provision. The rules implicitly approve a specific demand, but do not require one, and the pleading requirement of this statute clearly satisfies the express pleading requirements of both rules.

■ Article I, § 9, of the Indiana Constitution provides:

"No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible."

One appellant has presented the claim that the pleading restriction is a denial of the right of free speech and writing guaranteed by the above provision. Under our State Constitution, such an alleged impingement must be weighed in the balance against the public health, welfare and safety served. *State v. Kuebel*, (1961) 241 Ind. 268, 172 N.E.2d 45. In the scales the impingement upon the freedom guaranteed by this con-

stitutional provision resulting from the requirement that plaintiff demand reasonable compensation rather than a specific amount if discernible at all is small. On the other side of the scale the extent to which the public health and welfare is served by the restriction is also without considerable weight. Applying this test the scales weigh in favor of the public health and welfare. Accord: *Everett v. Goldman, supra.*

### VI.

A challenge is made to chapter 4 of the Act which creates the patient's compensation fund to be administered by the Indiana Insurance Commissioner, Ind. Code § 16–9.-5–4–1 through 16–9.5–4–3 on the basis that it violates Art. XI, § 12, of the constitution of Indiana which says in part:

"[N]or shall the credit of the State ever be given, or loaned, in aid of any person, association or corporation . . . ."

and Art. IV, § 23, which provides:

"In all the cases enumerated in the preceding Section, and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State."

Appellant contends that state tax money is used to aid a private enterprise, namely, health care providers, contrary to the Constitution when the cost of administering the compensation fund is paid from public funds. Appellant puts forth the fact that one million five hundred thousand dollars was appropriated from the general fund for the residual insurance authority by the Act. From the face of the statute it is evidence that the patient compensation fund is separate and distinct from the funds managed and controlled by the residual authority and therefore this appropriation is irrelevant to the claim which is made.

■ Pursuant to Ind. Code § 16–9.5–4–1(b) the patient's compensation fund is built from annual surcharges upon health care providers, and under Ind. Code § 16–9.5–4–1(h), "All expenses of collecting, protecting and administering the fund shall be paid from the fund." In creating and requiring the administration of the patient's compen-

**606**

sation fund in this manner the Act cannot be said to violate Art. XI, § 12 of our Constitution.

In *McGuffey v. Hall*, (1977) Ky., 557 S.W.2d 401, the Kentucky Supreme Court declared a similar act unconstitutional because it required that in the event the patient's compensation fund should become exhausted, further claims would be paid from the general fund. That exposure of the general fund was deemed contrary to § 177 of that state's constitution which prohibited giving or loaning the credit of the state to any person. In contrast, under Ind. Code § 16–9.5–4–1(j) of our Act, exhaustion of the fund results in a proration of amounts to be paid each claimant, and that portion of claims which is not paid will be paid in the following year. Because of this device, the general fund does not become guarantor of the obligations of the fund as was the case under the Kentucky statute, and therefore the case is unpersuasive.

■ The position of appellant with regard to the validity of the fund under Art. IV, § 23, is likewise not well taken. Appellant argues that the creation and management of the compensation fund inures solely to the benefit of a single segment of the State, namely, the health care providers, and is therefore special legislation. This argument again calls upon the Court to consider whether there is any rational basis for this classification. *Perry Civil Twp. of Marion County et al. v. Indianapolis Power & Light Co. et al., supra.* Throughout the State premiums for medical malpractice insurance were high and a large number of private companies were withdrawing their product from the market. These circumstances and conditions particularly affected health care providers and created the danger that health care services would not be maintained at their existing level contrary to the public interest. The classification was justifiable and the provisions of the Act creating the compensation fund are general and of uniform operation throughout the State.

The judgment of the trial courts in these four cases is affirmed.

GIVAN, C. J., and HUNTER, PRENTICE and PIVARNIK, JJ., concur.